# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

DOUGLAS DAVID TAIT,

      *Plaintiff*,

*v.*                                CASE NO. 2:13-cv-12667

CAROLYN W. COLVIN          DISTRICT JUDGE BERNARD A. FRIEDMAN
Commissioner of Social Security,    MAGISTRATE JUDGE PATRICIA T. MORRIS

      *Defendant.*

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned magistrate judge for the purpose of reviewing

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

the Commissioner's decision denying Plaintiff's claims for Disability Insurance Benefits ("DIB").

This matter is currently before the Court on cross-motions for summary judgment. (Docs. 9, 11.)

Douglas David Tait ("Plaintiff") was fifty-eight years old at the time of the most recent administrative hearing. (Transcript, Doc. 6 at 37, 106.) Plaintiff's work history report indicates that he worked as a material control manager in an automotive parts manufacturer from 1992 until 1997. (Tr. at 201.) He then was an inbound freight supervisor from 1998 until 1999, an owner and manager of an arcade from 1999 until 2001, and an extrusion technician at an automotive parts manufacturer from 2000 until 2009.[2] (*Id.*) On May 17, 2010, Plaintiff filed the present claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401 *et seq.* (Tr. at 170.) He alleged that he became unable to work on April 24, 2009. (*Id.*)

The claim was denied at the initial administrative stage. (Tr. at 106.) In denying Plaintiff's claims, the Commissioner considered muscle and ligament disorder, fascia, and "sprains and strains." (*Id.*) On February 8, 2012, Plaintiff appeared before Administrative Law Judge ("ALJ") Michael S. Condon, who considered the application for benefits de novo. (Tr. at 35-92.) In a decision dated February 17, 2012, the ALJ found that Plaintiff was not disabled. (Tr. at 21, 28.) Plaintiff then requested a review of this decision on March 12, 2013.[3] (Tr. at 16.)

---

[2] As discussed below, the evidence concerning his work history is conflicting.

[3] The request form was unsigned and undated, but the index to the Record states the request for review came on March 12, 2013, and the form appears date stamped on that day. (Tr. at 16.) However, as the Third Circuit held in a slightly different context, an unsigned request for review can result in a valid review. *Bordes v. Comm'r of Soc. Sec.*, 235 F. App'x 853 (3d Cir. 2007). Indeed, the Appeals Council could review on its own motion without a request. Soc. Sec. Admin., *Hearings, Appeals and Litigation Law Manual* § 1-3-3-1 (last updated 2005), *available at* http://ssa.gov/OP Home hallex/I-03/I-3-3-1.html. In any case, the Council denied review and neither party raises the issue. Thus, the lack of signatures is not dispositive and remand for further proceedings would be "futile and wasteful . . . ." *Weinberger v. Salfi*, 422 U.S. 749, 767 (1975).

The ALJ's decision became the Commissioner's final decision, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on May 8, 2013, when the Appeals Council denied Plaintiff's request for review. (Tr. at 2-3.) On June 18, 2013 Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision. (Doc. 1.)

## B.     Standard of Review

The Social Security system has a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the factual determinations to ensure they are supported by substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The administrative process provides multiple opportunities for reviewing the state agency's initial determination. The Plaintiff can first appeal the decision to the Social Security Agency, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). Once this administrative process is complete, an unsuccessful claimant may file an action in federal district court. *Sullivan v. Zebley*, 493 U.S. 521, 524-28 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction under 42 U.S.C. § 405(g) to review the Commissioner's final administrative decision. The statute limits the scope of judicial review, requiring the Court to "'affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The court's review of the decision for

substantial evidence does not permit it to "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). *See also Mullen*, 800 F.2d at 545. The court can only review the record before the ALJ. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). *See also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003). "[T]he . . . standard is met if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Longworth*, 402 F.3d at 595 (quoting *Warner*, 375 F.3d at 390). "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

A court's review of the Commissioner's factual findings for substantial evidence must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the

court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999))).

### C.   Governing Law

"'The burden lies with the claimant to prove that she is disabled.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (quoting *Foster*, 279 F.3d at 353). *Accord Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. § 401-34, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. § 1381-1385. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474. *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in

6

significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.   ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through December 31, 2014 and had not engaged in substantial gainful activity since April 24, 2009, the alleged onset date. (Tr. at 23.) At step two, the ALJ concluded that Plaintiff had the following severe impairments: lumbar compression fracture, lumbar degenerative disc disease, status-post throat cancer with radiation therapy, and right rotator cuff tear post-surgery. (*Id.*) At step three, the ALJ found that Plaintiff's impairment did not meet or equal one of the listings in the regulations. (Tr. at 23-24.) At step four, the ALJ found that Plaintiff was able to perform past relevant work as a freight supervisor, owner and manager of a video arcade, and material control clerk. (Tr. at 27-28.) Having disposed of the case at step four, the ALJ did not make findings at step five.

### E.   Administrative Record

The first medical report in the Record is a "Return Visit Note" from October 10, 2008, by Dr. Mark Prince. (Tr. at 435.) The report detailed Plaintiff's medical history, noting the diagnosis of throat cancer, neck surgery, and post-operative radiation treatment, all of which were completed "approximately [by] April 2005." (*Id.*) Dr. Prince found that he continued "to do well" since the last visit. (*Id.*) Aside from reflux pain already controlled by medication, Plaintiff denied any new symptoms and Dr. Prince's examination found no evidence of recurrent disease. (Tr. at 435-36.) His weight remained "essentially stable." (Tr. at 433.)

7

Plaintiff saw Stacey Voorheis, a physician's assistant on October 17, 2008, to "follow up" on his gastroesophageal reflux disease. (Tr. at 422.) Plaintiff was also concerned about losing four and a half pounds since May. (*Id.*) He had harsh breath sounds, but no wheezes, rhonchi, rales, or other abnormalities. (*Id.*) Ms. Voorheis planned to "update his blood work." (*Id.*)

On November 14, 2008, Plaintiff returned to Ms. Voorheis complaining of weight loss and fatigue. (Tr. at 421.) His work scheduled had recently changed, forcing him to work at night; his eating patterns were "messed up" and he thought this explained his weight loss. (*Id.*) Ms. Voorheis did not observe any abnormalities, although laboratory results showed elevated cholesterol and a blood count suggested microcytic anemia. (*Id.*)

Plaintiff hurt his shoulder at work on February 6, 2013, developing "pain or burning," without an accompanying "popping," after lifting an item above his head. (Tr. at 333.) An MRI completed by Dr. Andrew Kopystvnsky on February 20, 2013 was unremarkable: the physician noted no fracture, subluxation, dislocation, degenerative process, damage to the acromioclavicular ("AC") joint, or soft tissue calcifications. (Tr. at 293, 330.)

Another physician's assistant, Kevin Kaliszewski, examined Plaintiff's right shoulder on March 10, 2009. (Tr. at 333.) He shoulder had not given him problems in the past, Plaintiff reported, but he was limited to lifting fifty pounds or less at work. (*Id.*) Mr. Kaliszewski also noted joint pain, hypertension, and thyroid disease. (*Id.*) Nonetheless, Plaintiff had a good range of motion in his shoulders and Mr. Kaliszewski deemed them "stable." (*Id.*) Despite a "little bit of weakness with resistance of the right shoulder compared to the deft due to pain," there was no gross atrophy and x-rays were normal. (*Id.*) His arm reflex gave "a slight but definitely present response" on the reflex test, indicating neither normality nor abnormality. (*Id.*); H. Kenneth

Walker, *Deep Tendon Reflexes*, in *Clinical Methods: The History, Physical, and Laboratory Examinations* 365, 365 (H. Kenneth Walker, et al., eds., 3d ed. 1990) (explaining reflex test measurements). Mr. Kaliszewski "felt he perhaps ha[d] bursitis/tendonitis in the shoulder," provided him cortisone injections, and instructed him not to lift overhead and not to make other lifting motions with over twenty pounds. (Tr. at 333.)

Plaintiff followed up with Mr. Kaliszewski on March 24, 2009. (Tr. at 328.) The injection during the last appointment "helped a bit," but slight discomfort persisted: "[n]othing severe, but just chronic ongoing discomfort with certain movements," roughly one to three out of ten on a visual analog ("VA") scale. (*Id.*) He had not worked in the past week and he noticed improvement. (*Id.*) Mr. Kaliszewski again found "appropriate range of motion" and relative weakness in his right shoulder. (*Id.*) An MRI was ordered to see whether, as Mr. Kaliszewski believed, the shoulder had a labral injury. (*Id.*)

An arthogram MRI of the right shoulder on April 10, 2009 ordered by Dr. Diana Ennes "display[ed] an unremarkable appearance with some mild degenerative change at the AC joint."[4] (Tr. at 317-18, 323.) Another MRI showed the labrum was intact, the "biceps tendon [was] not normally situated within the bicipital groove and is somewhat posteriorly positioned," and the subscapularis tendon had a potential tear. (Tr. at 316, 320.)

Plaintiff obtained another MRI on the same day. (Tr. at 318, 324.) It showed "no evidence of a radiopaque foreign body" and the "visualized orbital floors and rims [were] intact and unremarkable." (*Id.*) Plaintiff brought the MRI results to Mr. Kaliszewski a few days later and, contrary to expectations, the labrum was intact. (Tr. at 326.) Plaintiff also noted that he had

---

[4] Plaintiff saw Dr. Ennes at least twice during April, but the notes are illegible. (Tr. at 313, 314.)

9

adhered to the work restrictions, but even activities like carrying pieces of wood hurt. (*Id.*) The range of motion remained "appropriate," and the shoulder "stable." (*Id.*) But Mr. Kaliszewski now noticed hesitancy and weakness at the extreme ranges. (*Id.*) They "tried anti-inflammatories" and planned to "try therapy." (*Id.*) If the situation failed to improve in a few weeks, Mr. Kaliszewski would consider surgery. (*Id.*)

Occupational therapy began on April 20, 2009 at St. Joseph Hospital. (Tr. at 311-12.) The therapist decided to treat the pain and strength loss with various modalities, three times per week for three weeks. (Tr. at 312.) Plaintiff rated the pain, which he described as "constant" and "dull," at level two on the VA scale when resting, three when active. (Tr. at 311.) The therapist believed he had fair prospects for rehabilitation. (*Id.*)

Plaintiff's next throat cancer check-up with Dr. Prince, on April 21, 2009, was unremarkable. (Tr. at 427.) "He has continued to do well since his treatment," Dr. Prince noted, "with no signs of recurrence." (Tr. at 427-28.) His voice was "mildly hoarse," but unchanged from prior visits. (Tr. at 427.) He had no new complaints and Dr. Prince found no abnormalities except "postsurgical changes involving the epiglottis and lateral pharyngeal wall which is stable." (*Id.*) His weight was "fairly stable." (*Id.*)

Dr. Ennes "re-evaluated" Plaintiff's shoulder on May 5, 2009, stating he observed a rotator cuff tear that conservative treatment had done little to help. (Tr. at 306.) His left shoulder had a normal range of motion; his right did not.[5] (Tr. at 310.) He decided "to go ahead with rotator cuff repair." (*Id.*) Laboratory results returned a few days later, showing normal ranges for most

---

[5] Dr. Ennes's examination notes testing motion, again inscrutable, do not include the specific day in May she saw Plaintiff. (Tr. at 310.)

measures but low chloride. (Tr. at 304.) At the end of May, he rated his pain at level two on the VA scale. (Tr. at 355.)

Plaintiff checked into the hospital on June 1, 2009 for the surgery, a supraspinatus tendon repair with bursectomy and decompression performed by Dr. Ennes. (Tr. at 296, 300, 346.) She noted that the "bursa was extremely inflamed and very swollen," and thus she diagnosed "severe bursitis." (*Id.*) She reported that Plaintiff's condition was "[g]ood" post-operation. (*Id.*)

Mr. Kaliszewski examined Plaintiff a little over one week later, on June 11, 2009. (Tr. at 348, 356.) His pain stayed steady at level two on the VA scale. (*Id.*) "He did not tolerate the Norco," Mr. Kaliszewski wrote, "so we switched him to Varvocet and he has been doing nicely . . . ." (*Id.*) The pain was "no[t] significant," and he remained in a shoulder immobilizer. (*Id.*) At the end of the month, on June 30, the pain decreased to level one on the VA scale and became intermittent. (Tr. at 347, 357.) Mr. Kaliszewski told him to remove the shoulder immobilizer three to four times per day so that he could complete pendulum exercises. (*Id.*) He also told Plaintiff to take Aleve and scheduled occupational therapy for the following week. (*Id.*)

Plaintiff continued to improve throughout July–Dr. Ennes concluded he was "doing quite well" on his July 21 appointment. (Tr. at 358.) His pain was now mere tingling. (*Id.*) He also developed "a little numbness" around his biceps after "passive motion," perhaps due to scarring, but in any case it would stop by the end of the day. (*Id.*) On August 20, he described the pain as dull and constant, and rated it at level one on the VA scale. (Tr. at 359.) He could move the shoulder forty-five degrees, but he achieved full range of motion passively with Dr. Ennes guiding his arm. (*Id.*) She recommended starting "full active motion" and planned to see him again in a month. (*Id.*)

Plaintiff was "doing beautifully" according to Dr. Ennes on September 17. (Tr. at 263, 360.) Despite having "a lot of weakness," which therapy could address, Plaintiff had a "good" range of motion and his pain was again only intermittent and either at level one or zero. (*Id.*) Dr. Ennes told him that "whenever he lifts he needs to lift with the proximal arm next to his body and use more . . . biceps rather than the rotator cuff for protection otherwise he will get a repeat problem." (*Id.*) She also wrote that he needed a "work note." (*Id.*)

The pain became constant within the following month. (Tr. at 361.) During an appointment with Mr. Kaliszewski on October 15, 2009, he said the pain, still at level one, was constant and "a bit worse with therapy." (*Id.*) He nonetheless noted that therapy helped his progress. (*Id.*) Mr. Kaliszewski observed the "better motion of his shoulder," yet also wrote that Plaintiff was "a bit sluggish with motion and has weakness." (*Id.*) He recommended continuing therapy two to three times per week. (*Id.*)

Plaintiff visited Dr. John P. Blocksom on January 6, 2010. (Tr. at 362-64, 379-81.) Reviewing Plaintiff's reports, Dr. Blocksom noticed that the 2009 surgery had not addressed Plaintiff's bicipital tendon. (Tr. at 363, 381.) Plaintiff had not yet returned to work, and he adhered to a one-pound lifting limit in his personal activities. (*Id.*) Therapy had continued, but he nonetheless complained to Dr. Blocksom of pain–which he rated at level one– in the front of his right soldier along the bicipital groove extending through the biceps. (*Id.*) He demonstrated "nearly full elevation, perhaps 175 degrees of full elevation to the right shoulder," along with "[g]ood extension," mild limits on rotations, mild discomfort on resisted elevation, "some strength deficits," and "some discomfort" in his right shoulder. (*Id.*) Plaintiff's Yergason's test, checking for bicipital tendinitis, E. Naredo, et al., *Painful Shoulder: Comparison of Physical Examination and*

*Ultrasonographic Findings*, 61 Annals of Rheumatic Diseases 132, 133 (2002), was unremarkable. (Tr. at 363, 381.)

Dr. Blocksom also reviewed prior reports. (Tr. at 364, 380.) He characterized the April 10, 2009 MRI as unremarkable, other than mild AC joint arthrosis; on other MRIs he noticed "some mild degenerative changes at the glenohumeral joint," "complete subluxation of the bicipital tendon," "rotator cuff tendinopathy with some impingement from the AC joint and what may even be a tear of the supraspinatus tendon, but certainly, at least, tendinopathy," and a possible "rent in the subscapularis tendon as well." (*Id.*) The MRIs also made the degeneration in the glenohumeral joint "[a] bit more obvious," and revealed "thinning of the rotator cuff tendon," "rather significant tendipathy," "a significant spur of the distal clavical," "significant synovitis within the range of the bicipital groove," and "a moderate amount of edema in the humerus head." (*Id.*) Summarizing the findings, Dr. Blocksom stated that Plaintiff "still has some anterior shoulder pain," likely due to bicipital tendinosis; nonetheless "he has regained good range of motion. His strength is a bit off the mark yet, but he has regained a significant amount of function following . . . surgery." (*Id.*) His one-pound lifting restriction was "certainly not . . . an endpoint" in his progress. (*Id.*) He ended by referring Plaintiff to a shoulder surgeon for possible anthroscopy. (*Id.*)

His letter on the same day to the insurance carrier was less sanguine. (Tr. at 362, 379.) "I do not think that Mr. Tait is recovered from his shoulder injury just yet," he informed the insurance case manager. (*Id.*) His condition was "stable . . . but not resolved," and he would need to remain off-work until a dedicated shoulder surgeon opined otherwise, "likely [after] some additional surgery." (*Id.*) He could not yet established permanent restrictions. (*Id.*)

The Record then jumps to Plaintiff's cancer examination with Dr. Donald Ellis on October 4, 2010. (Tr. at 418.) Dr. Ellis wrote that he was "doing relatively okay." (*Id.*) Dr. Ellis discovered a lesion, which he believed was either a patch of squamous cell cancer or an atypical keratoacanthoma, and sent for a pathology report after a biopsy. (*Id.*)

Plaintiff had a consultative examination with Dr. R. Scott Lazzara on December 10, 2010. (Tr. at 401-07.) Plaintiff reported his shoulder injury, now noting that "he felt a popping sensation in his right shoulder" when it occurred. (Tr. at 403.) Since his surgery he had not undergone pain management, done home therapy, used an assistive device, resumed working, or "had any follow-up treatment other than some post surgical follow-up." (*Id.*) Plaintiff reported that he could cook, wash dishes, and drive; had no problems sitting, standing, walking, or lifting with his left arm; and could not lift anything with his right arm. (*Id.*) He had started smoking cigarettes again, three to four times per month, after quitting six years prior. (*Id.*) He no longer drank alcohol, though he had a "history of alcohol use. (Tr. at 403, 407.) Plaintiff also noted that he had graduated college. (Tr. at 39, 403.)

Dr. Lazzara wrote that he appeared tremulous, but his mental status was normal. (Tr. at 404.) All other test results were normal, including shoulder elevation, abduction, adduction, and rotation. (Tr. at 404-405.) Plaintiff's right arm strength was slightly diminished at level four out of five. (Tr. at 407.) His reflexes were at "2+," (*Id.*), indicating a normal, "brisk response." Walker, *supra* at 365. Dr. Lazzara concluded that "anti-inflammatories may be indicated," and that he "had some findings of emphysematous disease." (Tr. at 407.)

On 27, 2010, Dr. Edward Brophy examined Plaintiff's medical reports for the State Disability Determination Services. (Tr. at 102.) The functional capacity report provided, among

other things, that Plaintiff could occasionally lift twenty pounds; frequently lift ten pounds; sit, walk, and stand, for six hours in the workday; and occasionally crawl and climb ladders, ropes, and scaffolds. (Tr. at 101-02.) Dr. Brophy justified the restrictions on crawling and climbing by simply noting that the "[a]rm/shoulder will be 'stressed' with repeated climb or crawl, so occasional." (Tr. at 102.)

Plaintiff suffered a seizure on February 19, 2011 and went to the emergency room at St. Mary Mercy Hospital. (Tr. at 438-78.) This was his first and only seizure in the Record. (Tr. at 440, 451.) Dr. Donald Ellis determined that the seizure was alcohol induced, noting Plaintiff's "history of heavy daily drinking" and also Plaintiff's protestation that "he did drink somewhat less the night before [than] he usually does." (Tr. at 440.) He admitted his substantial alcohol intake to various staff and physicians. (Tr. at 447, 450-51.) Blood work ruled out pancreatitis, and a cranial CT scan showed no evidence of "acute intracranial pathology." (Tr. at 455, 467.) He refused inpatient alcohol treatment. (*Id.*) Another physician diagnosed seizure, hypertension, psoriasis, hyperlipidemia, hypothyroidism, and a history of throat cancer. (Tr. at 443.) The day of his seizure, Dr. Michael Fox found him "alert, oriented, and cooperative," with fair insight and judgment, and "okay" mood and affect. (Tr. at 451.) However, he had some mental orientation difficulties the following day. (Tr. at 448.)

At the hospital, he complained of back pain and a CT scan confirmed a compression fracture of the L1 lumbar vertebra. (Tr. at 440, 465.) The scan found a moderate compression fracture, disk bulges at two levels, and atherosclerotic disease. (Tr. at 465-66.) The "deep aching" pain, exacerbated by all movement, did not radiate or cause numbness, tingling, or weakness. (Tr. at 444.) Despite the complaint's of pain, noted one physician, "he was able to log-roll himself to

15

the right side . . . ." (Tr. at 448.) A physician's assistant found "diffuse tenderness over the L1-L2 vertebrae" in Plaintiff's back. (Tr. at 445.) However, his leg strength was "5/5," his reflexes were normal, and he had no paraspinal tenderness. (*Id.*) Dr. Martin Kornblum concurred with the assistant's assessment: Plaintiff was not a candidate for kyphoplasty and he should wear a back brace, attend mild physical therapy, and take pain medication. (*Id.*)

On March 3, 2011, Plaintiff discussed the seizure and addiction issues with Dr. Ellis. (Tr. at 417.) His main complaint, however, was with swelling in his legs and a potential foot fracture. (*Id.*) He was "[d]oing relatively okay otherwise. . . . [He had] [n]o other real concerns or complaints." (*Id.*) A few days later, however, on March 9, he returned with gout and deep venous thrombosis. (Tr. at 416.) He had persistent limping and swelling. (*Id.*) Dr. Ellis prescribed him Coumadin and Lovenox. (*Id.*) On March 11, Dr. Emily Kloska, a physician at Dr. Ellis's office, wrote that the right foot was no longer painful or swollen. (*Id.*) Plaintiff continued to visit Dr. Ellis for "Coumadin check[s]" through the summer of 2011. (Tr. at 409-11.)

Plaintiff "seem[ed] to be doing better" on March 24, according to Dr. Ellis. (Tr. at 414.) During the appointment, Plaintiff complained of "significant low back pain," which was "not any worse . . . ." (*Id.*) Dr. Ellis recommended Plaintiff continue taking hydrocodone as needed.[6] (*Id.*) Dr. Ellis explained that he did not "want to do [another] x-ray or MRI. There is a poor correlation between severity of a vertebral compression fracture and the actual pain. The pain could last another few months or could heal. He could have long term chronic back pain from the compression fracture." (*Id.*)

_____

[6] He also used Norco to manage pain, apparently prescribed by Dr. Ellis in February 2011. (Tr. at 251.)

16

Plaintiff saw Dr. Ennes on May 3, 2011 to reevaluate his right shoulder. (Tr. at 484.) He rated the pain at level two on the VA scale and described it as dull and constant. (*Id.*) Dr. Ennes wrote that she had repaired the small tear in the infraspinatus tendon in 2009. (*Id.*) She stated, "I can't really see the biceps tendon because the tear was small. Subsequently, he began having more and more problems with the biceps tendon . . . and now, when I see him back today, he is having problems with the anterior shoulder . . . which is kind of classic for biceps tendinopathy." (*Id.*) She believed the tendon was intact but probably needed a tenodesis procedure. (*Id.*) She could not be certain, however, until he had another MRI. (*Id.*) His range of shoulder motion was "fairly good." (*Id.*)

The low back pain continued through his next appointment with Dr. Ennes on June 3, 2011, though he admitted it "seem[ed] to be getting better." (Tr. at 413.) It was now causing urinary urgency and a review of the CT scan from February uncovered the likely reason: the "retropulsion of the fractured vertebra . . . was pushing on the thecal sac." (*Id.*) Plaintiff denied severe numbness or tingling, stating he "learned to tolerate" the chronic pain and could complete simple chores. (*Id.*) Dr. Ellis explained potential nerve root impingement but did not order any tests or procedures, instead recommending that Plaintiff wear the back brace and return as needed. (*Id.*)[7]

---

[7] In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

Plaintiff submitted an unaddressed letter, enclosed with various records, on the same day the ALJ issued his opinion. (Tr. at 250.) The ALJ doubtless did not consider this submission; but the reports included a few lists from the Administration, along with a receipt from a pharmacy and a work background report. (Tr. at 251-54.) None of these provide new or helpful information.

Many of Dr. Ellis's 2011 and 2012 treatment notes fail to add much substantive information on the impairments. The majority relate to issues germane to workers' compensation cases but not nearly so relevant to Social Security disability. many deal with Plaintiff's medications, particularly his Coumadin prescription. (Tr. at 491, 493-95.) Others demonstrated his continued back pain. (Tr. at 492, 494.) As the ALJ confirmed at the hearing, Dr. Ellis did not perform any shoulder or back examinations during this period; instead he reviewed existing records and continued Plaintiff's prescriptions. (Tr. at 90-91.)

On the day of the hearing, February 8, 2012, Plaintiff submitted a pre-printed functional capacity form filled in by Dr. Ellis a few days prior. (Tr. 480-83.) Dr. Ellis estimated that Plaintiff could sit, stand, and walk each for two hour during a regular workday, and each for thirty minutes uninterrupted. (Tr. at 480.) Plaintiff could lift ten pounds occasionally and five pounds frequently, Dr. Ellis guessed, candidly conceding that no medical findings backed these figures. (*Id.*) Plaintiff could occasionally climb, balance, squat, kneel, crouch, and crawl, but never bend, twist, or stoop. (Tr. at 481.) Arm and hand movements, such as grasping and reaching, could be done occasionally. (*Id.*) Again, no medical findings specifically supported these conclusions. (*Id.*)

Dr. Ellis added that Plaintiff needed four to six unscheduled breaks per day, each for fifteen minutes, and would miss more than four work days per month. (Tr. at 482.) Effects from hydrocodone could potentially interfere with his productivity. (*Id.*) The answer to the ultimate issue–whether Plaintiff could sustain forty-hour work weeks–was "unknown." (*Id.*) He ended the

---

Plaintiff also submitted to the Appeals Council a hearing transcript consisting of Dr. Ennes's deposition testimony taken on July 21, 2011. (Tr. at 496-536.) The ALJ did not review this material. (Doc. 9 at 12 n.7.) She testified that before the June 2009 surgery she had diagnosed "pain and evidence of an impingement process," meaning inflammation or irritation in the shoulder. (Tr. at 505-06.) He recuperated from the operation relatively well, "up to a point, and then [he] started having more problems." (Tr. at 506.) She mentioned the "good motion" post-surgery and also an MRI showing a tear. (Tr. at 507.) She then acknowledged that her last visit with Plaintiff was on May 3, 2011, (Tr. at 508), when he would have been limited to light duty and a five-pound lifting restriction. (Tr. at 514.) "As far as the rotator cuff [was] concerned," she admitted the June 2009 surgery seemed successful, at least according to an MRI, a tool she estimated was wrong twenty percent of the time. (Tr. at 524.)

form by noting the dubious grounds for his own opinions: "filled this out to best of my ability but mult[iple] issues above not tested here[,] so answered with my 'best guess.' If [you] wish [for] definitive restrictions[,] [I] recommend [that] insurance send for [a] functional capacity assessment." (*Id.*)

At the hearing, Plaintiff testified that he lived with his wife and daughter, though the daughter was "away at school currently." (Tr. at 42.) He last worked in May 2009, leaving due to the torn rotator cuff injury that he claimed surgery failed to fully heal. (Tr. at 43, 49.) Specifically, he said he "was never released back to work by the surgeon . . . ." (Tr. at 50.) He had applied to work, however, through a job placement service in connection with his worker's compensation case. (Tr. at 43.) Discussing his past work, he explained that as an extrusion technician, he regularly lifted seventy-pound bags to chest height and occasionally handle one-hundred-pound metal pieces. (Tr. at 45.) Managing his video arcade was a "sedentary job," he explained, and "during those years" he made "something in the neighborhood of maximum $12,000." (Tr. at 47.)

He tore his rotator cuff in February 2009 as he lifted a five-pound scoop of plastic material and turned his shoulder to empty it into a hopper. (Tr. at 49.) He continued to work for months after because, he said, "[t]hey had me in physical therapy. I was still doing basically the same job," and he could call others to assist on heavy lifts. (*Id.*) His right arm still functioned and he "was still using it." (*Id.*) He further testified that he anticipated another surgery in the future. (Tr. at 50-51.) No physician was "looking at [his] arm currently," he noted. (Tr. at 52.) The one-pound lifting restriction remained unchanged, though Plaintiff acknowledged Dr. Ennes's deposition testimony that he might be able to lift five pounds. (Tr. at 53.) He had no MRIs or x-rays since February 2011. (Tr. at 70.)

The pain in his arm did not impede mobility; he lacked strength, however, and physical therapy had not done "any good." (Tr. at 54.) "[A]nything that extends the arm where the pain is" triggered more pain. (Tr. at 56.) His backache also persisted, due to the compression fracture and degenerative disc disease, but it had "probably improved twenty percent" and he had "weaned [himself] off of" the back brace. (Tr. at 58-59.)

He took over-the-counter acetaminophen for the back pain, as the prescription Norco was too expensive. (Tr. at 68.) The acetaminophen did a "good job" relieving pain, "[p]robably close to the same as the narcotic prescription." (*Id.*) Plaintiff agreed that an added benefit to over-the-counter treatment was the lack of significant side effects, although he was concerned that taking anything on a daily basis could harm his stomach. (Tr. at 69.)

The ALJ then inquired about other problems listed in the Record. (Tr. at 61-66.) The reflux was treated successfully and he no longer took medication for it. (Tr. at 61.) The gout, centered in his right leg and foot," was "controlled by medication." (*Id.*) The deep vein thrombosis was "under control" as well. (Tr. at 61-62.) His hypothyroidism was treated with medications and did not produce any symptoms or functional limitations. (Tr. at 63.) He had no kidney problems or anemia. (Tr. at 62-63.)He had not suffered a seizure since he stopped imbibing alcohol in February 2011. (Tr. at 64.) His throat cancer seven years prior, treated by "minor surgery" and radiation, "supposedly is completely cleared up," he told the ALJ, and it did not cause any functional incapacity. (Tr. at 65.) Plaintiff thus agreed that the "main problems" were shoulder and back pain. (Tr. at 66.)

He asserted that between forty-five minutes and three hours of sitting hurt his back. (*Id.*) He could walk for over one mile with only "minor discomfort" in his lower back. (Tr. at 68.) He

had no hobbies or routines that regularly took him out of his house, (Tr. at 70), although he indicated in pre-hearing paperwork that he went out once or twice per day. (Tr. at 216.) He also drove, shopped, and did daily chores, such as laundry and cleaning the dishes. (Tr. at 57-58, 70-71.) Using both arms, he could pick up fifteen pounds of cut wood to throw on the burner; but he could not shovel snow. (Tr. at 57-58.) However, chores sapped his stamina. (Tr. at 72.) He tried to alternate between sitting for forty minutes and standing forty minutes. (Tr. at 72-73.) He used a recliner to keep his legs raised six to eight times per day for fifteen to twenty minutes at a time. (Tr. at 73.)

A forty-hour workweek would "probably cause quite a bit of discomfort," he thought, even with a sit-stand option. (Tr. at 74.) As evidence, he described a busy two-day stretch during the recent holidays where his household workload of cleaning nearly doubled: he was "restricted to the couch with a back brace for another two to three days after that." (Tr. at 74-75.)

The ALJ then began questioning the vocational expert ("VE") Michelle Ross. (Tr. at 75.) Her pre-hearing work-history summary listed only two jobs: extrusion technician and freight supervisor. (Tr. at 242.) She was uncertain about his past work as an inventory clerk, so the ALJ allowed her to question Plaintiff. (Tr. at 78.) Her analysis of his past work in light of his testimony: the extrusion technician position was "heavy from his description, light per the DOT," and had a specific vocational preparation rating[8] ("SVP") of five; the freight supervisor had SVP of six, and was "sedentary from his description, light per the DOT"; owner and operator of an arcade was

---

[8] SVP is "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." DOT, *Appendix C* (4th ed. 1991). A rating of "five" represents six months to one year. *Id.*

skilled and sedentary, with an SVP of seven; and material controller is skilled and either sedentary or light, with an SVP of six. (Tr. at 83.)

> The ALJ then asked the VE to assume an individual with Plaintiff's background who
>
> is limited to doing light work. That is they [sic] can lift and or carry up to 20 pounds occasionally and 10 pounds frequently, sit for about six hours total and stand[] or walk for about six hours total in an eight hour work day. Occasionally climb ramps and stairs. Occasionally crawl. Do no over shoulder lifting or reaching with the right upper extremity. Would such an individual be able to perform any of the claimant's past work?

(Tr. at 83-84.) The VE responded that the individual could perform the freight supervisor, "manager," and material control positions. (Tr. at 84.) The ALJ then added to the hypothetical the following restrictions: "that person could do no kneeling or crawling. That person requires the option to alternate between sitting and standing as needed throughout the work day." (Tr. at 85.) The VE stated that these restrictions, particularly the sit-stand option, would preclude the individual from doing Plaintiff's past relevant work. (*Id.*)

The third hypothetical assumed the individual from the first, and added that the person could not kneel or crawl, and would have the "option to alternate sitting or standing where the person can sit for 40 minutes and then stand for long enough to stretch out; I'm going to say 10 minutes each time, and then sit again for 40 minutes." (Tr. at 86.) According to the VE, this individual could perform the "owner/operator or manager position," the material clerk, and the freight supervisor. (*Id.*)

The VE concluded that the same three past positions remained available if the individual from the third hypothetical additionally was limited to lifting no more than ten pounds with the right arm, but still no could not reach or lift over the shoulder with that arm. (Tr. at 86-87.) The final hypothetical took the individual from the previous hypothetical and added that "the person

can stand and/or walk for less than two hours total in an eight hour work day, but can sit for up to six hours total in an eight hour work day." (Tr. at 87.) The VE stated, "if that were to be interpreted as less than full time work, I don't believe [the individual] could do any of [the] past work." (*Id.*)

The VE then verified for Plaintiff's representative that no full-time work was available if he could "sit, stand or walk for any combination for a total of six hours a day . . . ." (Tr. at 88.) Reclining his feet six times per day for fifteen to twenty minutes would also prevent him from working. (*Id.*)

### F.    Analysis and Conclusions

### 1.    Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, she had the residual functional capacity ("RFC") to perform a limited range of light work:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he could lift and/or carry 20 pounds occasionally and 10 pounds frequently. The claimant could sit for about six hours in an eight-hour workday and stand and/or walk for about six hours in an eight-hour workday. He would require a sit-stand option where he where he could sit for 40 minutes and stand for 10 minutes to stretch. The claimant could occasionally climb ramps or stairs but not kneel or crawl. He could not perform over-shoulder lifting, reaching, or lifting over 10 pounds with the right upper extremity.

(Tr. at 24.) Light work

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b). He could therefore return to his past work as a freight supervisor, "owner/operator-video arcade," and material control clerk. (Tr. at 27.)

After review of the record, I suggest that the ALJ utilized the proper legal standard in her application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2. Substantial Evidence

If the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. 42 U.S.C. § 405(g); *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Plaintiff argues the ALJ erred by failing to address Dr. Brophy's opinion, improperly analyzing his credibility, and finding he could perform past relevant work. (Doc. 9 at 9-14; Doc. 14 at 1-4.) Specifically, Plaintiff faults the ALJ for ignoring Dr. Brophy's recommended limitation that Plaintiff only occasionally climb ladders, ropes, and scaffolds. (Doc. 9 at 9.) The RFC consequently lacked substantial evidence, he contends. (*Id.*) The ALJ allegedly botched the credibility analysis by inexplicably accepting only portions of Plaintiff's testimony and also unduly focusing on household chores. (*Id.* at 11-13.) Finally, Plaintiff asserts that the step four findings were inaccurate because (1) as he argued in his first two points, the RFC lacked substantial evidence; (2) the ALJ misinterpreted his earnings from the arcade; and (3) the ALJ failed to elicit an explanation from the VE regarding the discrepancy between the VE's testimony and the Department of Labor's *Revised Handbook for Analyzing Jobs*. (*Id.* at 13-14.)

I suggest that, although Plaintiff's work at the arcade was not past relevant work, substantial evidence nonetheless supports the ALJ's ultimate finding. I therefore recommend denying Plaintiff's Motion and granting Defendant's Motion.

### a.       Medical Sources and Credibility Claims

### i.       Legal Standards

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. § 404.1520(a)(3); *Wyatt*, 974 F.2d at 683. The regulations carve the evidence into various categories, but the only relevant distinction for present purposes is between "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). There are important differences between the two types of sources. For example, only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2.

Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the

statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources, including treating opinions not given controlling weight, 20 C.F.R. § 404.1527(c), and the ALJ should almost certainly use the same analysis for "other source" opinions as well. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at \*2. The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. § 404.1527(c).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at \*1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at \*1-2. The ALJ "will not give any special significance to the source of an opinion[, including treating sources]," regarding whether a person is disabled or unable to work, whether an

26

impairment meets or equals a Listing, the individual's residual functional capacity ("RFC"),[9] and the application of vocational factors. *Id.* § 404.1527(d)(3).

Additionally, a physician's "notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the 'opposite of objective medical evidence.' . . . An ALJ is not required to accept the statement as true or to accept as true a physician's opinion based on those assertions." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) (quoting *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)) "Otherwise, the hearing would be a useless exercise." *Id. See also Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (noting that there was no medical opinion in "Dr. Kllefer's pain-related statement . . . [because] it merely regurgitates Francis's self-described symptoms."); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) ("[S]ubstantial evidence supports the ALJ's determination that the opinion of Dr. Boyd, Poe's treating physician, was not entitled to deference because it was based on Poe's subjective complaints, rather than objective medical data.").

The regulations mandate that the ALJ provide "good reasons" for the weight he assigns the treating source's opinion in his written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

must contain specific reasons for the weight given to the treating source's
medical opinion, supported by the evidence in the case record, and must be

---

[9] The Commissioner's discretion to determine the claimant's RFC is less capacious than it appears at first. While the ALJ determines the RFC, the ALJ might be required to give controlling weight to treating source opinions on specific limitations. *See* 20 C.F.R. § 404.1513(b)-(c) (describing that medical reports can include a source's "statement about what [the claimant] can still do despite [her] impairments"). These opinions would necessarily affect the RFC. *See Green-Young v. Barnhart*, 335 F.3d 99, 106-07 (2d Cir. 2003) (holding that treating physician's opinion that claimant could not sit or stand for definite periods "should have been accorded controlling weight").

> sufficiently specific to make clear to any subsequent reviewers the weight the
> adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an

ALJ can properly reject a treating source opinion if it lacks supporting objective evidence. *Revels*

*v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273,

1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision). "This requirement is not

simply a formality; it is to safeguard the claimant's procedural rights." *Cole v. Astrue*, 661 F.3d

931, 937 (6th Cir. 2011). "[A] failure to follow the procedural requirement of identifying the

reasons for discounting the opinions and for explaining precisely how those reasons affected the

weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion

of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

When a disability determination that would be fully favorable to a claimant cannot be made

solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the

claimant, considering the claimant's statements about pain or other symptoms with the rest of the

relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility

determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y*

*of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility

assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No.

09-5773, 2011 WL 180789 at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379

(6th Cir. 2001)); *Warner*, 375 F.3d at 390. However, "[i]f an ALJ rejects a claimant's testimony

as incredible, he must clearly state his reasons for doing so." *Felisky*, 35 F.3d at 1036.

The social security regulations establish a two-step process for evaluating subjective

symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ

28

evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "'objective evidence of the pain itself'" is not required, *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweicker*, 749 F.2d 1066, 1071 (3d 1984)), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(I)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

29

20 C.F.R. § 404.1529(c)(3). *See also Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247. *See also Cruse*, 502 F.3d at 542 (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones*, 336 F.3d at 475 ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

ii.    *Dr. Brophy's Opinion and Plaintiff's Credibility*

Plaintiff's first argument points out that the ALJ did not explain a contradiction between the RFC and Dr. Brophy's functional report: Dr. Brophy limited Plaintiff to occasionally climbing ropes, ladders, and scaffolds; the ALJ's RFC did not include these limits. (Tr. at 24, 102.) In contrast, Dr. Brophy placed no restrictions on stair and ramp climbing, while the RFC said this could occur only occasionally. (*Id.*) Plaintiff asserts that the ALJ did not provide reasons for this difference, violating the requirement in Social Security Ruling 96-8p, 1996 WL 374184, at *7, that the "RFC assessment must always consider and address medical source opinions. If the RFC

30

assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."

In the RFC assessment, the ALJ noted Dr. Brophy's crawling and climbing limitations and stated, "[a]lthough the undersigned gave additional restrictions to the residual functional capacity, some weight was given to this opinion for the overall finding of not disabled as it is consistent with the medical evidence of record as a whole." (Tr. at 26.) He ended by construing his RFC as not only including Dr. Brophy's, but going beyond it: "State agency consultants are highly qualified experts . . . . Their assessment that the claimant retained the capacity to perform light work with occasional crawling and climbing activities was well supported by the objective medical evidence of record." (*Id.*)

This conclusion creates a slight ambiguity. Every mention of Dr. Brophy's assessment was positive. The ALJ suggested that he provided it only "some weight" because it did not go far enough, and he explicitly stated that Dr. Brophy's recommended restrictions on "climbing activities" had substantial objective support. (*Id.*) His hypothetical to the VE and the emboldened RFC in his decision do not include this restriction and instead place it on climbing ramps and stairs: limits not present in Dr. Brophy's report. (Tr. at 83, 101.) It therefore appears that the ALJ intended to include Dr. Brophy's climbing limits but mistakenly believed those limits were on climbing stairs and ramps rather than ropes, ladders, and scaffolds. Indeed, it would be anomalous for the ALJ to hold that Plaintiff could only occasionally mosey along ramps and stairs, and never

31

reach overhead with his right arm, but still could somehow shinny up ropes, climb scaffolds, and scale ladders.[10]

Nonetheless, the Court cannot rest on a post hoc gloss on the ALJ's decision–the ALJ, not the Court, must make the decision and clearly spell out her reasoning. *See S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947) ("If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive."); *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 192-93 (6th Cir. 2009) (noting that the court must review the action on the grounds the agency invokes); *but see* Bryan C. Bond, Note, *Taking It on the Chenery: Should the Principles of Chenery I Apply in Social Security Disability Cases?* 86 Notre Dame L. Rev. 2157, 2187 (2011). There are, however, other sufficient reasons to agree with the ALJ.

There is no dispute that the ALJ must consider agency physician opinions and afford them the same treatment as other acceptable sources. The rulings and regulations make this clear. State agency consultants, like Dr. Brophy, are called nonexamining sources, 20 C.F.R. § 404.1502, and they can qualify as acceptable sources if they are included in 20 C.F.R. § 1513(a). Dr. Brophy is a licensed physician, and thus qualifies as an acceptable medical source, *Id.*, who can provide

---

[10]Additionally, the "light work" limitation also seems to contradict any rope climbing. However, climbing limits are non-exertional while lifting limits are exertional. *See, e.g., Peterson v. Comm'r of Soc. Sec.*, 552 F. App'x 533, 537 (6th Cir. 2012) (upholding an ALJ decision where the RFC allowed lifting weight at the "light work" level, but not climbing ropes, scaffolds, or ladders); *Fitzpatrick v. Comm'r of Soc. Sec.*, No. 10-10309, 2010 WL 5625666, at *1, 5-6 (E.D. Mich. Dec. 23, 2010) (recommending upholding ALJ's RFC that plaintiff could lift weight at the "light work" level, but not climb ropes, scaffolds, or ladders), *adopted by* 2011 WL 202294 (E.D. Mich. Jan. 21, 2011), SSR 96-8p, 1996 WL 374184, at *5. Nonetheless, it seems logical to presume that a restriction on all overheard reaching or lifting above ten pounds with one arm would necessarily preclude climbing.

medical opinions. *Id.* § 404.1527(e). As a nonexamining source, his opinions are subject to the normal balancing test in 20 C.F.R. § 404.1527, as well as additional rules in subsection "e" of that regulation. This subsection states that the ALJ is "not bound by any findings made by State agency medical . . . consultants . . . ." *Id.* § 404.1527(e)(2)(I).

This does not mean, however, that a nonexamining consultative source merits significant deference. The Commissioner has characterized the regulations as prescribing "progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96-6p, 1996 WL 374180, at *2. These state consultants "can be given weight only insofar as they are supported by evidence in the case record . . . ." *Id.* Their probative value depends "on the degree to which they provide supporting explanations for their opinions." 20 C.F.R. § 404.1527(c)(3).

Courts therefore accord them less deference. *See Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1202 (9th Cir. 2008) ("'The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician." (quoting *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1996))*; Jones*, 336 F.3d at 477 (noting that a reviewing physician's opinion "is due, if anything, less deference than the treating physician's opinion"); *Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996) (holding that the opinion of the agency's reviewing physician is insufficient to constitute substantial evidence); *Beasley v. Astrue*, No. 4:08CV106-J, 2009 WL 805126, at *4 (W.D. Ky. Mar. 25, 2009) ("[T]he opinion of a non-examining State agency physician or psychologist is generally entitled to the least weight of all."); *but see Atterbery v. Sec. of Health & Human Servs.*, 871 F.2d 567, 570 (6th Cir. 1989) (finding that the opinion of an agency physician, based on objective records compiled by

treating physicians, could constitute substantial evidence). In *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 664 (6th Cir. 2004), the court found that the ALJ fulfilled his SSR 96-6p requirement by simply asserting he had considered the sources and gave them substantial weight.

Similarly, the limitations at issue here are not important to the ALJ's ultimate conclusion. Social Security Ruling 96-8p requires that the limitations the RFC imposes address seven exertional capacities or functions: "[s]itting, standing, walking, lifting, carrying, pushing, and pulling." 1996 WL 374184, at *5. The regulations provide the same list and also mentions other "postural functions, such as reaching, handling, stooping or crouching . . . ." 20 C.F.R. § 404.1545(b). Unless they are "work-related abilities" relevant to the case, rope, ladder, and scaffold climbing are not functions the RFC needs to address. *Id.* § 1545(d).

Moreover, courts construing this requirement have held that "an ALJ need not provide superfluous analysis of irrelevant limitations or relevant limitations about which there is no conflicting medical evidence." *Zatz v. Astrue*, 346 F. App'x 107, 112 (7th Cir. Oct. 5, 2009). *See also Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013) ("[A]t least five circuit courts 'have found that an ALJ is not required to discuss each factor in [his] opinion.'" (citing *Drennen v. Astrue*, No. 10-CV-6007, 2012 WL 42496, at *4 (W.D. N.Y. Jan. 9, 2012))); *Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547-48 (6th Cir. 2002) (noting that the ALJ does not need to discuss "capacities for which no limitation is alleged"); *Brown v. Comm'r of Soc. Sec.*, No. 4:12-cv-80, 2014 WL 835193, at *13 (E.D. Tenn. Mar. 3, 2014) ("SSR 96-8p clearly states that the ALJ must consider each function separately; it does not state that the ALJ must discuss each function separately in the narrative of the ALJ's decision.") (adopting report and recommendations). The

Ruling mentions "climbing" as a non-exertional postural capability, but does not specifically discuss climbing ropes, ladders, and scaffolds. SSR 96-8p, 1996 WL 374184, at *6.

Ladder, rope, and scaffold climbing "are not usually required in sedentary work," the Commissioner has noted. SSR 96-9p, 1996 WL 374185, at *8. One court citing SSR 96-9p, faced with an RFC omitting the climbing restrictions contained in a medical opinion, found that there was no error because the limitations "were not inconsistent with the ability to engage in a full range of sedentary work." *Cicero v. Colvin*, No. 12-279, 2014 WL 1689301, at *4 (M.D. La. April 29, 2014) (adopting report and recommendation). In other words, the restrictions do not significantly affect the availability of sedentary jobs. These climbing abilities also "have very little or no effect on the unskilled light occupational base." SSR 83-14, 1983 WL 31254, at *5.

In fact, an ALJ is not even required to consult a VE to determine whether climbing limitations significantly change a claimant's occupational base. AR 14-1(8), 2014 WL 2178029, at *3 & n.2 (May 22, 2014) (*Brock v. Astrue*, 674 F.3d 1062 (8th Cir. 2012)). *See also Johnson v. Astrue*, No. 3:08CV324, 2009 WL 840545, at *6 (E.D. Va. Mar. 26, 2009) (adopting report and recommendation); SSR 85-15, 1985 WL 56857, at *6 (noting climbing generally has little affect on job base). For young adult claimants, the Commissioner considers evidentiary inconsistencies on climbing to be "immaterial in an unfavorable determination or decision" because it "would not affect the outcome." SSR 11-2p, 2011 WL 4055665, at *18.

The restrictions here are largely irrelevant to Plaintiff's past work. The only place in the Record mentioning rope, ladder, and scaffold climbing is Dr. Brophy's opinion. (Tr. at 102.) Plaintiff never suggested that these were relevant limitations during his extensive discussion of past work at the hearing. (Tr. at 44-48, 77-82.) In his paperwork, he stated he never climbed in any

35

of the past relevant work cited in the ALJ's decision. (Tr. at 205.) Plaintiff described his work at the arcade and as a material control manager as "sedentary." (Tr. at 47, 48.) The Plaintiff's hearing representative described the freight supervisor position as "sedentary," (Tr. at 244), a conclusion also advanced by the VE.[11] (Tr. at 83.)

Thus, Dr. Brophy–a source who requires attention but no real deference in the ALJ's findings–is the only individual in the Record that considered this limitation, and he only did so because it was on a pre-printed form. The ALJ considered this opinion, and it appears that he even attempted to exceed its restrictions. This meets the Sixth Circuit's standard in *Thacker* for analyzing nonexamining sources.

This restriction, moreover, is not something that the regulations contemplate for exertional restrictions and the relevant rulings or regulations diminish its significance in the classes of work at issue in the present case. Had Dr. Brophy not included it as a limitation, any discussion of it would have been the sort of superfluous analysis courts do not require from the ALJs. Additionally, the presence or absence of this limitation does not significantly affect the availability of sedentary jobs or even unskilled, light work because most such jobs do not require climbing. Plaintiff's past relevant work was of these types.

Dr. Brophy's form opinion on climbing, however, triggered the ALJ's obligation to explain any contradiction with the RFC. SSR 96-8p, 1996 WL 374184, at *5. Nonetheless, remands in many similar cases are ordered only where the ALJ made no mention of the alleged limitation conflicting with the RFC. *See, e.g.*, *Morett v. Colvin*, 4:13-CV-01344, 2014 WL 37750, at * (N.D.

---

[11]Sedentary work does not, without more, preclude climbing, as indicated by cases describing climbing limitations in addition to sedentary work restrictions. *See, e.g.*, *Schmiedebusch v. Comm'r of Soc. Sec. Admin.*, 536 F. App'x 637, 643-44 (6th Cir. 2013); *Shideler v. Astrue*, 688 F.3d 306, 308-10 (7th Cir. 2012).

Ohio Jan. 6, 2014) (remanding where ALJ failed to discuss consultant's opinion); *Potts v. Astrue*, No. 3:07-cv-1284, 2009 WL 2168731, at *6 (M.D. Tenn. July 17, 2009) (remanding where ALJ did not "address" agency consultant's opinion).

Here, in contrast, the ALJ did discuss the restrictions from Dr. Brophy, compared them with other opinions, and explicitly mentioned the climbing restrictions twice. (Tr. at 26.) He explained that Dr. Brophy's restriction on "occasional . . . climbing activities was well supported by the objective medical evidence of record." (*Id.*) The only reason he provided for contradicting the physician's report was that Plaintiff required "additional restrictions." (*Id.*) Thus, while he provided a rationale and referenced objective medical evidence, which he investigated elsewhere, he did not explain why he failed to limit certain climbing activities. In fact, he explains why he adopted them, not rejected them. Assuming this was not a mistake, and the ALJ intended to provide no restrictions on climbing ropes, scaffolds, and ladders, his explanation is insufficient.

The ALJ's error, however, was harmless. Courts have deemed as harmless an ALJ's failures to unerringly follow regulations and agency rulings where substantial evidence supported the ALJ's decision. *Heston*, 245 F.3d at 535-36 (holding that no remand was necessary where ALJ failed to cite a medical report by claimant's treating physician); *Masters v. Astrue*, No. 07-123-JBC, 2008 WL 4082965, at *2 (E.D. Ky. Aug. 29, 2008) (holding that no remand was required where ALJ did not "strictly abide" by an agency ruling).

These limitations have a negligible impact on the job base and consequently, if remanded, the ALJ would not even be required to obtain VE testimony concerning how the restrictions would erode Plaintiff's ability to do his past relevant work. Also, the ALJ's RFC was, in many ways, more restrictive than Dr. Brophy's. Finally, as Defendant notes, the Dictionary of Occupation

Titles ("DOT") shows that climbing is not required for freight-loading supervisors. DOT 910.137-026, *Freight-Loading Supervisor*, 1991 WL 687731 (4th ed. 1991). Plaintiff has thus failed to provide any reason for concluding that the ALJ's decision would change if any alleged error were remedied. *Collette v. Astrue*, No. 2:08-CV-085, 2009 WL 32929, at *9 (E.D. Tenn. Jan. 6, 2009) ("[E]ven if [the consulting physician's] opinion were fully adopted, the ALJ's ultimate conclusion would remain the same–that plaintiff remains able to perform past relevant work. Any error . . . is therefore harmless . . . .").

The ALJ also properly analyzed Plaintiff's credibility. (Tr. at 26.) First, he examined Plaintiff's daily activities, noting that he had some difficulties but could handle personal care, read, and occasionally complete household chairs. (Tr. at 26, 213-20.) Plaintiff counters that daily activities do not necessarily rise to the level of full-time work. (Doc. 9 at 12.) *See Rogers*, 486 F.3d at 248-49; *Barker-Bair v. Comm'r of Soc. Sec.*, No. 1:06-CV-00696, 2008 WL 926569, at *11 (S.D. Ohio Apr. 3, 2008) ("It is well recognized that a claimant's ability to perform limited and sporadic tasks does not mean she is capable of full-time employment."). To the extent daily activities are relevant, however, the ALJ correctly noted that here they provided evidence of residual capabilities: he must consider them, 20 C.F.R. § 404.1529(c)(3), they do not here show lack of capability, and he properly qualified his reliance on them.[12]

---

[12] Plaintiff suggests in a footnote that "if the ALJ was unsure as to how Plaintiff's fractured vertebrae affected his work-related abilities, the ALJ should have ordered an updated consultative examination." (Doc. 9 at 11 n.6; Doc. 14 at 1-2.) However, the ALJ has substantial discretion in her decision to order such examinations. While the ALJ must gather facts and put forward arguments for both sides, *Sims v. Apfel*, 530 U.S. 103, 111 (2000), the burden of producing evidence rests squarely with Plaintiff. *Ferguson*, 628 F.3d at 275. He must offer evidence demonstrating "the existence and severity of limitations caused by [his] impairments . . . ." *Jones*, 336 F.3d at 474. *See also* 20 C.F.R. § 404.1512(c) ("You must provide evidence, without redaction, showing how your impairment(s) affects your functioning . . . ."). This includes proving his residual functional capacity. *Jones*, 336 F.3d at 474.

Ultimately, "[t]he burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant." *Landsaw v. Sec'y of Health*

Plaintiff next argues that the credibility analysis is insufficient because "the ALJ did not explain why he did not accept Plaintiff's full testimony regarding his right arm." (Doc. 9 at 12.) The Record mentions a one-pound lifting restriction, but Dr. Blocksom said this "certainly was not . . . an endpoint . . . ." (Tr. at 364.) The ALJ also noted Dr. Lazzara's findings that Plaintiff had only "some weakness" in his right arm, at level four out of five. (Tr. at 25, 407.) He further described Plaintiff's substantial recovery from surgery and his consistently good range of motion and reflexes. (Tr. at 25-26.) Moreover, he also highlighted Dr. Ellis's recent opinion that Plaintiff could occasionally lift ten pounds and frequently lift five pounds. (Tr. at 26, 480.) He included in the RFC Dr. Brophy's opinion that Plaintiff could occasionally lift twenty pounds and frequently lift ten pounds. (Tr. at 24, 101.) Plaintiff admitted at the hearing that he carried fifteen pounds of cut wood from the porch to his burner inside. (Tr. at 58.) His leg strength remained at "5/5" immediately following his compression fracture. (Tr. at 445.)

The ALJ also noted that Plaintiff has been treated conservatively, with prescription medication and treatment, and successfully since his surgery in June 2009. (Tr. at 26, 296, 300, 346, 414, 445.) Indeed, he consistently rated his pain at the lowest levels on the VA scale, and

---

& *Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986). The Commissioner will help "develop" a claimant's medical record by making "every reasonable effort to help [a claimant] get medical reports from [her] own medical sources," 20 C.F.R. § 404.1512(d), and ordering consultative examinations when necessary *Id.* § 404.1519a. Courts apply the abuse-of-discretion standard to review this decision. *Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 675 (6th Cir. 2009).

The ALJ here did not err by failing to order an additional examination that the Plaintiff never requested. Plaintiff must produce evidence proving his disabilities: the ALJ assembled substantial evidence to show he did not. Moreover, Plaintiff barely even raises this argument, let alone develop it, and he likely waived it by failing to raise it at the hearing level. *Sims*, 530 U.S. 103; *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011); *Howard v. Comm'r of Soc. Sec.*, 330 F. App'x 128, 130 (9th Cir. 2009); *Anderson v. Barnhart*, 344 F.3d 809, 814 (8th Cir. 2003); *Brady v. Barnhart*, 36 F. App'x 914 (9th Cir. 2002); *Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999); *Watson v. Astrue*, No. 08 Civ. 1523, 2010 WL 1645060, at *3-4 (S.D. N.Y. Apr. 22, 2010).

expressed the same to his physicians and other medical staff. (Tr. at 263, 347-48, 356-63, 381, 404-05, 413, 417, 445, 484.) Even his complaints of bicipital tendon pain, which the surgery did not correct, rated only one on the VA scale. (Tr. at 363, 381.)

He told the ALJ at the hearing that his over-the-counter pain medications were "doing a good job. . . . Probably close to the same as the narcotic prescription," but without significant side effects. (Tr. at 68-69.) The ALJ correctly concluded that such modest treatment is inconsistent with a finding of disability. *See Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1001 (6th Cir. 2011); *Myatt v. Comm'r of Soc. Sec.*, 251 F. App'x 332, 334-35 (6th Cir. 2007).

The ALJ's decision was supported by substantial evidence and any errors were harmless. Therefore, I recommend denying Plaintiff's Motion on his first two claims and granting the Plaintiff's Motion on these grounds.

### b. Plaintiff's Past Relevant Work

Plaintiff's final contention takes aim at the ALJ's ultimate step-four finding that Plaintiff could perform past relevant work. (Doc. 9 at 13-14.) First, Plaintiff asserts that the step four determination lacks substantial evidence due to the errors in the RFC and credibility assessments described above. (Tr. at 13.) And for the same reasons given above, this claim fails. In particular, the ALJ's hypothetical accurately conveyed the RFC to the VE and thus he could rely on the VE's testimony. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Mich. 1993). "'Substantial evidence may be produced through reliance on the testimony of a vocation expert in response to a hypothetical question, but only if the question accurately portrays [the] plaintiff's individual physical and mental impairments.'" *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 2009) (quoting *Varley v. Sec. of Health & Human*

*Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)) (adopting report and recommendation). To the extent the ALJ erred by not including the climbing instructions, the error is harmless: the VE testified that Plaintiff performed the jobs at the sedentary level, (Tr. at 47-48, 83, 244 ), and the Commissioner has repeatedly stated that including or excluding the climbing restrictions does not significantly affect the occupational base. *See, e.g.*, SSR 96-9p, 1996 WL 374185, at *8. The DOT states that climbing is unnecessary in freight supervisor positions. DOT 910.137-026, *Freight-Loading Supervisor*, 1991 WL 687731. In short, Plaintiff cannot demonstrate that his preferred RFC would change the outcome.

Plaintiff next argues that the ALJ committed reversible error by failing to elicit from the VE a reasonable explanation for the conflict between his testimony and the Department of Labor's *Revised Handbook for Analyzing Jobs*. (Doc. 9 at 14.) The VE testified that Plaintiff could be a material clerk without kneeling, while the *Handbook* states the position requires frequent kneeling. (Doc. 9 at 14; Doc. 14 at 3-4.) Social Security Ruling 00-4p mandates that the ALJ "ask about any possible between the VE . . . evidence and information provided in the DOT." 2000 WL 1898704, at *4 (2000). Specifically, the ALJ must ask the VE whether the testimony conflicts with the DOT, and also "obtain a reasonable explanation" if the testimony "appears to conflict with the DOT." *Id.* The DOT also includes "it companion publication, the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles," ("SCO"). *Id.* at *1.

Plaintiff's claim falls for two reasons. First, the neither the DOT nor the SCO incorporates the *Revised Handbook*, though the SCO contains a few references to it. *See Antle v. Comm'r of Soc. Sec. Admin.*, No. 3:10-CV-02136, 2012 WL 833200, at *9 (N.D. Tex. Mar. 13, 2012) (noting that any conflict with between VE testimony and the *Revised Handbook* would be, "[a]t best . . .

implied or indirect").[13] The Commissioner has not taken administrative notice of the *Revised Handbook*. *See* 20 C.F.R. § 404.1566(d). As one court concluded, "in absence of proof that the *Commissioner* takes administrative notice of the [*Revised Handbook*] information, or otherwise embraces it as authoritative, the court cannot connect the dots in such a way as to conclude that a [*Revised Handbook*]-conflict runs afoul of either circuit law of Soc. Sec. R. 00-4p . . . ." *Gaspard v. Comm'r Soc. Sec.*, 609 F. Supp. 2d 607, 614-17 (E.D. Tex. 2009) (adopting report and recommendation). Therefore, the Ruling does not apply to conflicts between VE testimony and the *Revised Handbook*.

Even if a conflict arose under Social Security Ruling 00-4p, the ALJ satisfied his duty by asking the VE to notify him if a conflict existed. (Tr. at 76.) *See Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 606 (6th Cir. 2009) ("There is little doubt that the ALJ satisfied his obligation under S.S.R. 00-4p by asking [the] VE . . . about any apparent discrepancies between the information provided by the DOT and that which [the VE] himself presented. . . . We do not see a material difference between asking if there are any 'discrepancies' and asking whether there are any 'conflicts.'"); *Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 374 (6th Cir. 2006) ("Nothing in SSR 00-4p places an affirmative duty on the ALJ to conduct an independent investigation into the testimony of witnesses to determine if they are correct.").

Plaintiff's last argument has merit, but the error he points to was harmless. He contends that the ALJ inflated his earnings from the arcade, thus making it past relevant work under the

---

[13] Some cases, however, use the *Revised Handbook* to define or categorize functional levels left unexplained in the DOT. *See Haase v. Astrue*, No. EDCV 11-1902, 2012 WL 3670693, at *5-8 (C.D. Cal. Aug. 27, 2012). In that case, however, the RFC clearly included the relevant limitation, and therefore no conflict existed and the court was spared the need to analyze whether conflicts with the *Revised Handbook* triggered the requirements in Social Security Ruling 00-4p.

regulations; the true figure would not alone qualify for past relevant work status. (Doc. 9 at 13-14.) Defendant responds that Plaintiff waived the argument by failing to flag it at the hearing. (Doc. 13 at 8-9.) It is necessary to dispose of this argument before addressing the merits.

Defendant is correct that at the hearing neither Plaintiff nor his representative explicitly denied the job was past relevant work. (Tr. at 37-92.) But he had no compelling cause for concern at that time. He testified that the earnings were a "maximum [of] $12,000" over the "years" he owned the business and, because the ALJ knew the length of ownership, Plaintiff could be confident that the ALJ would calculate the correct monthly earnings and see that they did not meet the regulations. (Tr. at 47.) If he was still worried after testifying, the exchange between the VE and the ALJ would have assuaged him. The VE noted that based on "the earnings it didn't appear that there was much in that self employment" at the arcade. (Tr. at 77.) The ALJ agreed, promised to review the earnings, and said that "at least for our purposes today" they would examine the job. (Tr. at 78.) Finally, Plaintiff's post-hearing brief disputed that the arcade was past relevant work. (Tr. at 248-49.) Defendant's waiver argument is therefore baseless.

The Record lacks enough evidence to determine whether managing his business was past relevant work. Past relevant employment is work within the past fifteen years that was substantial gainful activity ("SGA") and "that lasted long enough" for the claimant to learn it. 20 C.F.R. § 1560(b)(1). Substantial activity is "work activity that involves doing significant physical or mental activities." *Id.* § 404.1572(a). Gainful work activity "is work activity that you do for pay or profit . . . whether or not a profit is realized." *Id.* § 404.1572(b). Courts have used these general definitions to find that self-employed work was SGA constituting past relevant work. *See Hurley v. Comm'r of Soc. Sec.*, No. 13-10009, 2013 WL 6631263, at *14-15 (E.D. Mich. Dec. 17, 2013);

43

*King v. Astrue*, No. 3:10-0750, 2011 WL 2433685, at *11-12 (M.D. Tenn. June 14, 2011). For claimants who were self-employed, SGA can be shown by "[s]upervisory, managerial, advisory or other significant personal services that [the claimant] perform[ed] as a self-employed individual . . . ." 20 C.F.R. § 404.1573(d).

"The adjudicative criteria for determining whether a person has done 'substantial' and 'gainful' work activity are explained in . . . [20 C.F.R. §] 404.1575 . . . ." SSR 82-62, 1982 WL 31386, at * (1982). The regulation establishes three tests, including the one the ALJ used here, that each give rise to a presumption of SGA in self-employment. *See Kaliardos v. Sec'y of Health & Human Servs.*, 872 F.2d 1026, 1989 WL 25795, at *2 (6th Cir. 1989) (describing the regulations and presumptions) (unpublished table decision); *Kenney v. Comm'r of Soc. Sec.*, No. 3:09 CV 2440, 2010 WL 5441628, at *5-6 (N.D. Ohio Dec. 10, 2010) (same). *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1031 (6th Cir. 1990) (characterizing analogous regulation for regular employment as creating a presumption of substantial gainful activity). The tests employ income measures, but the Commissioner "will not consider income alone," 20 C.F.R. § 404.1575(a)(2), as it "is not a reliable factor" in the self-employment context. SSR 83-34, 1983 WL 31256, at *2 (1983).

The first test finds SGA if the claimant (1) rendered services significant to the business's operations, and (2) received substantial income from the business. 20 C.F.R. § 404.1575(a)(2)(I). If the individual worked alone, the service is "necessarily 'significant.'" SSR 83-34, 1983 WL 31256, at *2. *See also* 20 C.F.R. § 404.1575(b)(1). "Substantial income" is "countable income"–essentially net income with additional deductions–that either (1) averages more than the amount published in the SGA Earnings Guidelines, or (2) if it is less than the Guidelines, it is

44

"comparable to that of unimpaired self-employed persons in [the claimant's] community who are in the same or a similar business as their means of livelihood." 20 C.F.R. § 404.1575(c). Where countable income is insufficient, it is "necessary to obtain evidence regarding the community standard of livelihood for businesses of a similar nature." SSR 83-34, 1983 WL 31256, at *8.

The final two tests disregard income and instead focus on the claimant's actual labor and its value. Under the second test, SGA occurs if the claimant's "work activity, in terms of factors such as hours, skills, energy output, efficiency, duties, and responsibilities is comparable to that of unimpaired individuals in [the claimant's] community who are in the same or similar businesses as their means of livelihood." 20 C.F.R. § 404.1575(a)(2)(ii). The last test gauges SGA by the value of the work to the business, which must be "clearly worth" the amount in the Guidelines or comparable to a salary an employee would earn for similar work. *Id.* § 404.1575(a)(2)(iii). Social Security rulings emphasize the importance of obtaining factual evidence to provide the relevant comparisons. SSR 83-34, 1983 WL 31256, at *9-10.

Courts consequently require a sufficient evidentiary basis for these tests. *Ogle v. Barnhart*, 123 F. App'x 361, 364 (10th Cir. 2005) ("The record contains almost no information about Ms. Ogle's work experience as a dog groomer and business owner. The ALJ did not elicit any testimony on this topic. . . . On remand, the ALJ should develop the record sufficiently to permit him to ascertain whether Ms. Ogle's past work . . . qualified as [SGA]."); *Peterson v. Chater*, 72 F.3d 675, 678 (8th Cir. 1995) (refusing to uphold findings under test two, and remanding, because "there is no evidence in the record as to (I) whether there is anyone in the . . . community [with a similar livelihood] . . . and (ii) if there is such an unimpaired person, how his or her activities . . . would compare to [the claimant's]); *Weber v. Astrue*, No. CV-10-3112, 2012 WL 274707, at *3-7

45

(E.D. Wash. Jan. 31, 2012) (remanding case for additional fact-finding for the second and third SGA tests). *See also Weiland v. Barnhart*, 239 F. Supp. 2d 875, 896 (N.D. Iowa 2002) (finding no SGA under tests two and three because "[t]he record is entirely devoid of any evidence that would suggest there were unimpaired individuals in Weiland's community whose means of livelihood was comparable to Weiland's work . . . . [and] there is no evidence to prove" his work was worth a comparable salary). *But see Byington v. Chater*, 76 F.3d 246, 249-51(9th Cir. 1996) (upholding finding of SGA on the ALJ's conclusion that claimant's work was comparable to similar business activities, based largely if not exclusively on claimant's testimony; but the testimony included comparisons to others).

The ALJ here appears to have, wittingly or not, used the first test to analyze Plaintiff's self-employment. The arcade was a single-person business, satisfying the significance requirement. 20 C.F.R. § 404.1575(a)(2)(I). For the "substantial income" prong, the ALJ relied exclusively on Plaintiff's somewhat vague testimony that he made a "maximum" of $12,000.00 as the owner of the arcade from 1999 until 2001. (Tr. at 47.) Because this exceeded the Guidelines levels, the ALJ concluded the work was SGA and the job was past relevant work. (Tr. at 27.) This construes the evidence with misleading clarity.

First, even if $12,000.00 represented the accurate total earnings figure for the entire period, the ALJ still could not determine whether Plaintiff engaged in SGA for any portion of that time. When the SGA Guideline level changes during a period of continuous self-employment, the Commissioner "will average [the claimant's] earnings separately for each period in which a different substantial gainful activity earnings level applies." 20 C.F.R. § 404.1574a(b). The level changed during this period: it was $700.00 per month from July 1999, when Plaintiff began, (Tr.

46

at 201), until the end of 2000; and it was $740.00 per month from January 2001 until May 2001, when Plaintiff closed his business, (*Id.*) Soc. Sec. Admin., *Program Operations Manual System* DI 25001.001(84) (hereinafter "POMS").[14] Averaged over the entire twenty-three months, he earned approximately $521.00 per month, well below the level for any period. Without any sure means to apportion the total, however, the ALJ could not make any findings supported by substantial evidence.

The Record does contain other evidence allowing a more accurate allotment of earnings to the proper periods. In his work history report, Plaintiff reported that he earned $100.00 per week. (Tr. at 203.) This results in monthly wages of roughly $433.00 for every period, which is less than the Guideline levels.

Plaintiff's Federal Insurance Contributions Act ("FICA") report shows yearly self-employment earnings of $445.00 and $2099.00; but these were from 2004 and 2005, respectively.[15] (Tr. at 177.) The report has no self-employment wages from 1999, 2000, or 2001. (Tr. at 176-77.) Moreover, wages in those years came from work at other businesses. (*Id.*) Yet, Plaintiff's work history report stated he worked at the arcade eleven hours per day, seven days. (Tr. at 203.)

The history becomes murkier still. In his Disability Report he listed self-employment from January 1999 until December 2002. (Tr. at 187.) There he wrote that he worked four hours per day, six days per week, earning $2,000.00 per year. (*Id.*) Additionally, he reported beginning work as

---

[14] POMS is not legally binding, but "it is nevertheless persuasive." *Davis v. Sec'y of Health & Human Servs.*, 867 F.2d 336, 340 (6th Cir. 1989).

[15] FICA covered earnings include wages paid for reasons such as illness or disability that are arguably not "earned" through activity. 26 U.S.C. § 3121. Nevertheless, courts rely on FICA earnings in disability cases. *See Jaramillo v. Astrue*, No. 08-CV-2837, 2009 WL 4722251, at *1, 4-6 (E.D. NY. Dec. 9, 2009) (using FICA earnings to determine that claimant engaged in SGA).

an extrusion technician in the middle of this period in November 2000. (*Id.*) At the hearing he stated the arcade was "[f]ull-time" work: while he could have done both, the testimony implies that he did not. (Tr. at 47.)

In short, substantial evidence does not support the ALJ's SGA finding based on income. The evidence is conflicting and contradictory, and would not support any conclusion for the first SGA test. Nor does evidence support any findings that could be made, but were not, on tests two and three. The ALJ did not consider the necessary evidence and the Court cannot make the requisite factual determinations. To the extent any relevant evidence appears in the Record, (Tr. at 46-47, 77-79), it would not allow a fact-finder to make meaningful comparisons between similar businesses and Plaintiff's work and its worth.

As noted above, however, the ALJ's findings on Plaintiff's other past relevant work remain standing. Therefore, his analysis of Plaintiff's self-employment is superfluous, and the error harmless, as in numerous cases where the ALJ's error did not affect the substantial evidence supporting other findings showing the claimant could perform other work. *DeKruger v. Comm'r of Soc. Sec.*, No. 08-10410, 2009 WL 596123, at *12 (E.D. Mich. Mar. 9, 2009) ("[E]ven though Plaintiff's job as a companion does not appear to rise to the level of SGA at step four, and thus, should not be considered past relevant work, this Court should still affirm the Commissioner's finding, because the record and the ALJ findings support a step five determination that Plaintiff is not disabled."); *see also Lopez v. Comm'r of Soc. Sec.*, No. 1:11-cv-00310, 2012 WL 1434991, at *15 (E.D. Cal. Apr. 25, 2012)("even if the ALJ erred in determining Plaintiff could perform his past relevant work because that work did not amount to substantial gainful activity, any error is harmless" where ALJ made proper Step Five findings); *Gay v. Astrue*, No. 2:11-cv-659, 2012 WL

1165104, at *8 (M.D. Ala. Apr. 6, 2012 )("[T]he court concludes that any alleged error based on analysis involving Gay's [past relevant work' is harmless because of the ALJ's alternative finding that Plaintiff's residual functional capacity for a full range of medium work allowed for the determination that Plaintiff was not disabled.").

###    3.    Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

##    III.    REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of*

*Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  July 28, 2014                    /S PATRICIA T. MORRIS
                                        Patricia T. Morris
                                        United States Magistrate Judge